**S.G., Appellant–Petitioner,**

v.

**REVIEW BOARD OF THE INDIANA DEPARTMENT OF WORKFORCE DEVELOPMENT and T.C., Appellees–Respondents.**

No. 93A02–1011–EX–1241.

Court of Appeals of Indiana.

Aug. 26, 2011.

Publication Ordered Oct. 12, 2011.

■■■■■■■■■

Edward P. Grimmer, Austgen Kuiper & Associates, P.C., Crown Point, IN, Attorney for Appellant.

Gregory F. Zoeller, Attorney General of Indiana, James E. Porter, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellees.

## OPINION

CRONE, Judge.

### Case Summary

This case involves an employee who was fired from her part-time job for poor attendance. She filed a claim for unemployment benefits, believing that her absences should have been excused because of her personal and family health issues. After an unemployment claims representative denied her claim for benefits, she appealed to an administrative law judge ("ALJ"). The ALJ held a hearing and determined that she was ineligible for benefits because her employer was justified in firing her. The unemployment review board affirmed the denial of benefits. The employee, S.G., now appeals, claiming that the review board erred in determining that she was ineligible for unemployment benefits because of her excessive absenteeism. Finding no error, we affirm.

### Facts and Procedural History

T.C. is a contract employment firm that provides employees for businesses. George is the owner and manager of an insurance agency, where his wife Deborah is employed as a licensed sales producer. The insurance agency pays T.C. a service fee to manage its payroll. On February 7, 2005, T.C. sent S.G. to work part-time for the insurance agency. Although she worked at the insurance agency, she was on T.C.'s payroll. For approximately five years, she worked at the insurance agency fifteen hours per week as a licensed producer and earned $13.00 per hour. Her duties included answering phones, doing maintenance changes, and taking quote information. She worked a regular schedule from 9:00 a.m. to noon each Monday through Friday. Because George and Deborah arranged their work days to arrive at the office at noon and S.G. was the only person who worked mornings, S.G. had the additional responsibility of opening up the office each day. The insurance agency did not have a formal attendance policy.

On March 23, 2010, S.G. was scheduled to undergo medical tests during her regular work hours. When she was leaving the office at noon on March 22, 2010, she notified George about her tests, and he expressed his dissatisfaction with the lack of notice and emphasized that due to the nature of his small business, he could not afford to have her out of the office without advance notice. S.G. knew that there was an informal policy requiring advance notice of absences and that the ordinary practice was to email notice to George. Tr. at 18–19. She later said she thought that she had given George or Deborah one or two weeks' notice about the tests, but she could not remember exactly when she gave notice. *Id.* at 17. George never received any email about the tests. Notwithstanding the late notice, George agreed to her request, and S.G. went for her tests. She remained off work for four days.

On April 21, 2010, S.G.'s mother became ill and was hospitalized. Midway through her morning shift on Friday, April 23, 2010, S.G. called George at home and stated that she was closing the office and leaving for the hospital because her mother had been placed in intensive care.

George had to "scramble" to get to the office as soon as possible because no one else worked during those hours. *Id.* at 7. On Sunday, April 25, 2010, S.G. phoned George and Deborah's home and notified Deborah that she would not be at work on Monday, April 26, 2010, due to her mother's deteriorating condition. According to S.G., Deborah told her to take whatever time she needed. During the next two and a half weeks, S.G. and other family members took turns monitoring her mother's condition at the hospital. In all, S.G. missed thirteen and a half consecutive work days due to her mother's illness. S.G. was in contact with Deborah several times during her extended absence, but she spoke with George only once, if at all. George said that she generally called the office at times during which she knew he did not ordinarily work. *Id.* at 7. George and Deborah made several attempts to call S.G. to determine when she would be returning to work.

At some point during after the second week of hospitalization, S.G.'s mother's condition greatly improved. During a May 6, 2010 conversation, Deborah told S.G. that they had been forced to obtain a replacement worker from T.C. to cover her shifts and that the insurance agency could not take her being off much longer. On Friday, May 7, S.G. called Deborah and reported that she would be back to work on Monday, assuming that her mother's condition remained stable, and that she would call on Sunday to confirm. She did not call on Sunday, and she did not report for work on Monday, May 10 or Tuesday, May 11.

At 10:00 a.m. on May 12, 2010, S.G. came to the office and spoke with the replacement worker who was covering her shifts. She told her replacement that she would do anything to keep her job there. That afternoon, S.G. called Deborah and told her that her mother was doing better

and that she would be returning to work the next day. When she asked Deborah whether she still had a job, Deborah told S.G. to address the issue with George. That night, George sent S.G. a letter notifying her that she was being discharged for excessive absenteeism. The letter included the following explanation: "Unfortunately we are a small business and having an employee gone for a long period of unexpected time is hard on all of us. You've been gone almost 3 weeks for this latest issue, and we can't afford that much of a gap in coverage any longer." Appellant's App. at 32. Shortly after receiving her termination letter from George, S.G. also received a termination letter from T.C. Immediately thereafter, she filed a claim for unemployment benefits. On July 21, 2010, a claims deputy from the Department of Workforce Development issued a determination that S.G. was ineligible for unemployment benefits because she "was discharged for just cause." *Id.* at 39. On July 28, 2010, S.G. filed an appeal with the ALJ. Following an August 20, 2010 telephone hearing, the ALJ issued findings of fact and conclusions of law, affirming the claims deputy's determination of ineligibility. On September 14, 2010, S.G. appealed the ALJ's determination to the Review Board of the Department of Workforce Development ("Review Board"). On October 26, 2010, the Review Board summarily affirmed the ALJ's determination of ineligibility and specifically incorporated and adopted the ALJ's findings of fact and conclusions of law. This appeal ensued. Additional facts will be provided as necessary.

**Discussion and Decision**

■ S.G. contends that the Review Board's ineligibility determination was contrary to law. The Indiana Unemployment Compensation Act ("the Act") provides unemployment benefits to individuals who are "unemployed through no fault of their own." Ind.Code § 22–4–1–1. An in-

dividual who was discharged from her most recent employment for "just cause" is ineligible for unemployment benefits. Ind. Code § 22–4–15–1(a).

■ The Act provides that any decision of the Review Board shall be conclusive and binding as to all questions of fact. Ind.Code § 22–4–17–12(a). When the Review Board's decision is challenged as being contrary to law, our review is limited to a two-part inquiry into: "(1) the sufficiency of the facts found to sustain the decision; and (2) the sufficiency of the evidence to sustain the findings of facts." *McClain v. Review Bd. of Ind. Dep't of Workforce Dev.,* 693 N.E.2d 1314, 1317 (Ind.1998) (quoting Ind.Code § 22–4–17–12(f)). Applying this standard, we review "(1) determinations of specific or 'basic' underlying facts, (2) conclusions or inferences from those facts, sometimes called 'ultimate facts,' and (3) conclusions of law." *McClain,* 693 N.E.2d at 1317. The Review Board's findings of basic fact are subject to a "substantial evidence" standard of review. *Id.* In conducting our analysis, we neither reweigh evidence nor judge witness credibility; rather, we consider only the evidence most favorable to the Review Board's findings. *Id.* The Review Board's conclusions regarding ultimate facts involve an inference or deduction based on the findings of basic fact, and we typically review them to ensure that the Review Board's inference is "reasonable" or "reasonable in light of its findings." *Id.* at 1318 (citation and quotation marks omitted). We review the Review Board's conclusions of law using a de novo standard. *Ind. State Univ. v. LaFief,* 888 N.E.2d 184, 186 (Ind.2008).

■ S.G. first argues that George lacked just cause to discharge her for ex-

cessive absenteeism because the insurance agency did not have a formal attendance policy. However, in making this argument, she relies on the previous version of Indiana Code Section 22–4–15–1(d), which did not have a specific reference to situations where the employer lacks a formal attendance policy. In 2009, the Indiana General Assembly amended the statute to address just such a scenario: " 'Discharge for just cause' . . . is defined to include . . . (3) *if an employer does not have a rule regarding attendance,* an individual's unsatisfactory attendance, if the individual cannot show good cause for absences or tardiness." *Id.* (emphasis added). In such cases, the statute places the primary burden on the employer to establish *just cause* (unsatisfactory attendance) for discharging the employee; once met, the employee must come forward with evidence to establish *good cause* for her poor attendance.

In *Giovanoni v. Review Board of Indiana Department of Workforce Development,* 927 N.E.2d 906 (Ind.2010), our supreme court addressed the issue of an employee's excessive health-related absenteeism in the face of a formal no-fault attendance policy. *Giovanoni* was decided based on the prior version of Indiana Code Section 22–4–15–1(d), and the majority opinion included a footnote stating, "We express no opinion as to the statute as amended." 927 N.E.2d at 909 n. 3. In his concurring opinion, Justice Dickson expressed concern that readers might mistakenly apply the majority's reasoning to future cases construing the 2009 amendments and characterized the amendments as an *"expansion* of the definition of 'discharge for just cause,' " *Id.* at 912 (emphasis added).[1]

---

1. As stated, unlike the present case, *Giovanoni* involved an employer with a formal no-fault attendance policy. Thus, even if the 2009 amendments had been applicable, the opinion would have addressed subparagraph-(d)(2), not the amended language in subparagraph-(d)(3).

The instant case falls squarely within the language of the amended version of subparagraph-(d)(3). The record is undisputed that S.G. missed seventeen and a half days of work within an eight-week period. The Review Board found this to be unsatisfactory attendance, for which S.G. had failed to demonstrate good cause.

S.G. contends that her personal and family health concerns as well as her conversations with Deborah amounted to good cause for her unsatisfactory attendance such as to negate the employer's just cause for discharging her. The parties do not dispute that personal and family health issues are generally considered to be legitimate substantive reasons for missing work. *See White v. Rev. Bd. of Ind. Emp't Sec. Div.*, 151 Ind.App. 426, 431, 280 N.E.2d 64, 67 (1972) ("Most every wage earner, at various periods during h[er] productive life, faces family emergencies and matters of urgent personal nature. Such absences may if reasonable and not habitual be excused.").

 In his termination letter, George expressed to S.G. his sympathy regarding the health concerns that led to her absences, but stated that his reason for terminating her was the excessive length of her absence and the ensuing burden on the business. S.G. argues that George is estopped from making such a claim because Deborah initially told her to "take all the time that [she] need[ed]" to attend to her mother's illness. Tr. at 18.

An equitable estoppel requires a false representation or concealment of material facts; it must have been made with knowledge, actual or constructive, of the facts; the party to whom it was made must have been without knowledge or the means of knowledge of the real facts; it must have been made with the intention that it should be acted on; and the party to whom it was made must have relied on or acted on it to his

prejudice. Equitable estoppel may arise from silence or acquiescence as well as from positive conduct.

*City of New Albany v. Cotner*, 919 N.E.2d 125, 133–34 (Ind.Ct.App.2009) (citations and quotation marks omitted).

The record indicates that George and Deborah initially acquiesced to S.G. missing work to attend to her sick mother. S.G. relied on their acquiescence and kept in touch with Deborah regularly for about a week. Notably, as her mother's health began to improve, the frequency of her communication with George and Deborah began to wane, and during a May 6, 2010 phone call, Deborah told S.G. that her absence had been extremely burdensome and that it would not be tolerated much longer. On Friday, May 7, S.G. told Deborah that she would return to work on Monday, May 10 and confirm by phone call on Sunday, May 9. However, she neither called on Sunday nor returned to work on Monday. Instead, without a word, she missed work both Monday and Tuesday of that week. When she made an appearance midway through her regular shift time on Wednesday, it was merely to once again declare her *intent* to return to work.

Based on the foregoing, we conclude that as of May 6 at the latest, George and Deborah no longer acquiesced to S.G.'s absences. After her May 6 conversation with Deborah, S.G. could no longer reasonably believe that she had open-ended permission to be absent. First, S.G. knew that her employment circumstances were unique in that the insurance agency had such a small staff that she was the only person who ordinarily worked during morning business hours. Moreover, she testified that there was an informal policy requiring advance notice of absences and that the ordinary practice was to communicate with George via email. Yet, even her phone calls diminished as her absence con-

tinued. Finally, S.G.'s actions contradict her argument that Deborah's May 6 admonition lacked the specificity to place her on notice that her continued absenteeism could put her job in jeopardy because (1) the very next day, S.G. stated that she would be back to work after the weekend, and (2) when she stopped by the office on May 12, 2010, she demonstrated her concern for her job security by mentioning her fear of job loss to both her replacement and Deborah.

In sum, George and Deborah met their primary burden of establishing just cause based on S.G.'s unsatisfactory attendance in missing seventeen and a half days within an eight-week period. Although the record supports S.G.'s assertion that George and Deborah initially acquiesced to her absences, the record also indicates that, as of Deborah's May 6 admonition followed by S.G.'s failure to return to work on May 10 through May 12, S.G. was no longer justified in believing that she could continue to be absent with impunity. Thus, S.G. failed to establish that her *continued* absence was justified by good cause as required under Indiana Code Section 22–4–15–1(d)(3). Thus, we conclude that the record supports the Review Board's determination that S.G. was discharged for just cause and therefore was not entitled to unemployment benefits. Accordingly, we affirm.

Affirmed.

ROBB, C.J., and NAJAM, J. concur.

### ORDER

The Appellee, Review Board of the Indiana Department of Workforce Development, by counsel, has filed a Motion To Publish.

Having considered the matter, the Court FINDS AND ORDERS AS FOLLOWS:

1. The Appellee's Motion To Publish is GRANTED and this Court's opinion heretofore handed down in this cause on August 26, 2011, marked Memorandum Decision, Not for Publication is now ORDERED PUBLISHED.

ROBB, C.J., NAJAM, CRONE, JJ., concur.